UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PATRICIA WELLS,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        No.  4:13CV1259 TIA
                                         )
CAROLYN W. COLVIN, Acting                )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

<u>**MEMORANDUM AND ORDER**</u>

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Patricia Wells's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et*

*seq.*  All matters are pending before the undersigned United States Magistrate

Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the

Commissioner's final decision is supported by substantial evidence on the record

as a whole, it is affirmed.

## I.  Procedural History

On January 27, 2010, the Social Security Administration denied plaintiff

Patricia Wells's October 7, 2009, application for disability insurance benefits

(DIB) in which she claimed she became disabled on July 1, 2003, because of

bulging discs in the back and neck, fibromyalgia, chronic obstructive pulmonary disease, depression, and right upper extremity numbness. (Tr. 61, 65-69, 112-15, 140.) Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on December 15, 2011, at which plaintiff testified. (Tr. 43-60.) On January 3, 2012, the ALJ denied plaintiff's claim for benefits, finding plaintiff not to be disabled prior to the expiration of her insured status on December 31, 2005. The ALJ found plaintiff's disorders of the back to be her only severe impairment during the relevant period and that, prior to the expiration of her insured status on December 31, 2005, plaintiff could perform the full range of light work, which resulted in a finding of "not disabled" as directed by the Medical-Vocational Guidelines. (Tr. 27-38.) On May 15, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Plaintiff specifically argues that the ALJ failed to undergo the proper analysis in formulating her residual functional capacity (RFC). Plaintiff also claims that the ALJ improperly discounted the medical opinion evidence of record and should have obtained the opinion of a medical advisor to determine whether the date of onset occurred prior to the date last insured. Finally, plaintiff claims that the ALJ

erred in determining her credibility and by failing to consider third party observations when evaluating her subjective complaints. Plaintiff requests that the final decision be reversed and that the matter be remanded for an award of benefits or for further consideration. For the reasons that follow, the ALJ did not err in his determination. [1]

## II. Testimonial Evidence Before the ALJ

At the hearing on December 15, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-five years of age. Plaintiff stands five feet, two inches tall and weighs 156 pounds. Plaintiff testified that she weighed about 142 pounds in December 2005. Plaintiff is married. Plaintiff attended college for two years. (Tr. 47, 49.)

Plaintiff's Work History Report shows that plaintiff worked for Kanes Keeping, Inc., in 1996 and 1997. From 1998 to 2002, plaintiff worked for Jeannette G. Murray, a dog groomer. In 2002 and 2003, plaintiff worked at Value City Department Stores. (Tr. 53, 122-23.) Plaintiff testified that she and her

---

[1] The ALJ found plaintiff's fibromyalgia and mental impairments not to be severe and/or medically determinable prior to December 31, 2005. (Tr. 29.) Plaintiff does not challenge the ALJ's findings or analysis relating to these non-severe impairments but instead focuses her claims on the ALJ's treatment of her musculoskeletal impairment. Accordingly, while the undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, the recitation of specific evidence in this Memorandum and Order is limited to only that evidence relating to the issues raised by plaintiff on this appeal.

husband considered purchasing a dog grooming business in 2006 or 2007, but that her impairments prevented her from doing the grooming work more than a day or two. (Tr. 49-50.)

Plaintiff testified that during her period of insured status, she was limited by impairments of her neck, back, and right shoulder from which she had suffered since she was twenty-eight years of age. Plaintiff testified that her condition worsened with her work as a dog groomer because of her arms constantly being elevated. (Tr. 50-51, 56-57.) Plaintiff testified that she could not work full time grooming dogs because of the pain associated with her impairment. (Tr. 53.) Plaintiff testified that her lifting ability was also limited, and she had to quit her retail job because of her inability to lift ten pounds. (Tr. 56.) Plaintiff testified that her impairments have since worsened. (Tr. 50-51.)

Plaintiff testified that, prior to 2005, her physician believed she had a tear in the shoulder blade, and she underwent traction for the condition. Plaintiff testified that surgery performed in 2006 initially helped. Plaintiff testified that her medications during the relevant period were Trazodone, Prozac, and a nerve pill. Plaintiff testified that she was currently receiving cortisone injections in the spine. (Tr. 51-52, 55.)

Plaintiff testified that she has a driver's license but limits her driving because of difficulty with her arms. Plaintiff testified that she drove herself forty-

five minutes to the hearing.  (Tr. 47-48.)

### III.  Relevant Medical Records Before the ALJ

Plaintiff visited Dr. Thomas R. Forget, a neurologist, on March 31, 2003, with complaints of decreased vision in her left eye.  It was noted that plaintiff was taking Prozac, hormone replacement therapy, and Fiorinal and codeine for headaches.  Plaintiff reported to be in good general health, and she had no musculoskeletal complaints.  Motor and sensory examination was normal. Plaintiff underwent testing for possible aneurysm.  (Tr. 174-90.)

Plaintiff visited Dr. Leonard Lucas on December 9, 2004, with complaints of pain in the left ankle aggravated with walking.  A venous examination of the left leg performed that same date yielded normal results.  Indocin was prescribed, and plaintiff was instructed to elevate the leg.  (Tr. 363, 409.)

Between August 27, 2004, and March 29, 2005, Dr. Lucas prescribed Levaquin, Prednisone for allergies, Trazodone, Alprazolam (Xanax), Prozac, and Zoloft for plaintiff.  (Tr. 364, 367.)

Plaintiff visited Dr. Lucas on June 22, 2005, and was diagnosed with right shoulder tendinitis.  Plaintiff was referred to physical therapy.  (Tr. 360.)

Plaintiff visited Farmington Sports and Rehabilitation Center on June 28, 2005, upon referral from Dr. Lucas for evaluation relating to tendinitis of the right shoulder.  Plaintiff reported having pain for about ten years with such pain

increasing with use of the right arm.  Plaintiff reported that she had to return to work as a dog groomer in a couple of weeks after being semi-retired for some time and that she wanted to prepare her shoulder for such work.  Plaintiff reported no other significant medical history.  Plaintiff's medications were noted to include hormone replacement therapy, Prozac, and a muscle relaxer taken as needed.  Plaintiff reported her shoulder pain to currently be at a level seven out of ten.  Physical examination showed limited active range of motion about the right shoulder.  A plan for strengthening and treatment was put in place.  (Tr. 402-04.)

Plaintiff visited Dr. Lucas on August 10, 2005, with complaints of bilateral shoulder pain.  Plaintiff reported that therapy helped, but that the pain returns once therapy ends.  Decreased range of motion about the right shoulder was noted with increased pain.  Physical therapy was continued for both shoulders.  (Tr. 356, 396-98.)

MRIs of the right and left shoulders dated August 16, 2005, yielded negative results.  (Tr. 399, 400.)

Between March and September 2005, Dr. Lucas prescribed Singulair, Trazodone, ibuprofen, and hormone replacement therapy for plaintiff.  (Tr. 362.)

On December 15, 2005, plaintiff reported to Dr. Lucas that she was having trouble with her neck and shoulder blades.  Plaintiff was referred for an orthopedic consultation.  (Tr. 351.)

On December 21, 2005, and January 13, 2006, Dr. Lucas prescribed Darvocet for plaintiff to take as needed for headaches. (Tr. 393, 394.) Between October 2005 and February 2006, Dr. Lucas also prescribed Prozac, Xanax, Singulair, Fiorinal, Trazodone, and Prednisone for plaintiff. (Tr. 352-54.)

On February 23, 2006, plaintiff visited Dr. Duane Turpin, a neurologist, with complaints of a twenty-year history of shoulder pain and discomfort. Plaintiff's medications were noted to be hormone replacement therapy and Prozac. Dr. Turpin noted MRI results to show disc and osteophyte abnormality at C5-6 and C6-7, with mild flattening of the cervical spinal cord noted at that level. Dr. Turpin also noted EMG studies to show bilateral C6 radiculopathy of an acute and chronic nature. Physical examination showed full strength in the upper extremities, bilaterally, but with absent biceps and brachioradialis reflex on the right. Dr. Turpin opined that plaintiff had cervical radiculopathy/myelopathy and recommended that plaintiff participate in physical therapy. Upon being advised that plaintiff had already done so, Dr. Turpin recommended a neurosurgical consultation. (Tr. 391, 392.)

On March 7, 2006, plaintiff visited Dr. Kevin D. Rutz, an orthopedic specialist, upon referral by Dr. Lucas for spinal consultation in response to plaintiff's complaints of chronic persistent back and bilateral upper extremity pain, paresthesias, and weakness. Plaintiff reported having experienced the symptoms

for twenty years but that they had worsened. Plaintiff reported the symptoms to worsen with bending, lifting, and exercise and to be relieved with rest. Plaintiff reported having no hand weakness and no gait or balance abnormalities. Plaintiff's medications were noted to include codeine and ibuprofen, and plaintiff reported her treatment to date to only be physical therapy. Physical examination showed plaintiff's gait to be smooth. Plaintiff was able to heel and toe walk. Plaintiff had decreased range of motion with flexion and extension secondary to neck pain and right-sided upper trapezius pain. Observation of the spine was unremarkable. Tenderness to palpation was noted across the midline cervical spine and bilateral paraspinal musculature in the cervical spine with pain in the bilateral parascapular region. Plaintiff was noted to have full strength in the upper extremities, bilaterally. Positive impingement signs were noted in the right shoulder. Dr. Rutz noted an MRI dated February 3, 2006, to show moderate disc degeneration at C5-6 with a small right-sided disc herniation and degenerative changes at C6-7. It was also noted that an EMG study showed evidence of C6 radiculopathy. Plaintiff was diagnosed with cervical spondylosis, cervical disc herniation, and cervical radiculopathy. A nerve root block was scheduled. (Tr. 233-35.)

On March 17, 2006, plaintiff underwent a nerve root injection at the C6 level of the spine. (Tr. 238.) On March 23, Dr. Rutz reported to Dr. Lucas that the nerve root block significantly improved plaintiff's right arm and shoulder pain but

that plaintiff continued to complain of neck pain with radiation to the right shoulder. Dr. Rutz informed Dr. Lucas that, because of plaintiff's long history of symptoms that were slowly getting worse, a cervical discectomy and fusion would be performed. (Tr. 232.)

On March 29, 2006, plaintiff underwent a C5-6 and C6-7 anterior cervical discectomy and fusion with a prosthetic implant. It was noted that plaintiff had a longstanding history of neck pain and bilateral arm pain (right greater than left) and that diagnostic testing showed cervical radiculopathy and cervical spinal stenosis. Plaintiff was otherwise healthy, with her only medications noted to be Prozac and hormone replacement therapy. Plaintiff was discharged on March 30, 2006, with adequate pain control on oral pain medications. (Tr. 217-22.)

Plaintiff returned to Dr. Rutz for follow up on April 11, 2006, who noted plaintiff to continue to show mild to moderate impingement symptoms in the right shoulder. A Depo-Medrol injection to the shoulders relieved plaintiff's discomfort. Plaintiff's prescription for Vicodin was refilled, and Dr. Rutz instructed plaintiff to slowly increase her activity level. (Tr. 231.) On May 9, plaintiff reported to Dr. Rutz that injections to her shoulders provided significant improvement and she was able to decrease her pain medication. Plaintiff was noted to have no restrictions. (Tr. 230.) On June 29, Dr. Rutz noted plaintiff to continue to have no restrictions but that she had some residual shoulder bursitis

and trapezial tightness. Dr. Rutz instructed plaintiff to resume exercises for the condition. (Tr. 229.)

Plaintiff visited Farmington Sports and Rehabilitation Center on September 14, 2006, with complaints of pain in her upper back since undergoing surgery in March 2006. Plaintiff reported that she could not work a full day as a dog groomer because of her pain. Plaintiff reported that she currently took no pain medication. Physical examination showed limited range of motion about the cervical spine with flexion, extension, and bilateral rotation. Plaintiff had full range of motion about the upper extremities, bilaterally. Diminished reflexes were noted about the right upper extremity. Tenderness to palpation was noted about the upper trapezius and levator scapulae musculature. It was determined that plaintiff's signs and symptoms were consistent with muscular strain and that plaintiff would benefit from an overall strengthening program and modality treatments to control muscle spasms and pain. (Tr. 255-57.) Plaintiff participated in physical therapy on four additional occasions through October 4. Plaintiff reported no significant change in her symptoms with therapy. (Tr. 252-54.)

Plaintiff returned to Dr. Rutz on October 19, 2006, with complaints of persistent aching between her shoulder blades, primarily aggravated with lifting. Plaintiff reported being frustrated with her attempts to return to work because of the condition. Dr. Rutz questioned whether there was non-union or delayed union

at the C6-7 level.  (Tr. 228.)  A CT scan of the cervical spine showed solid fusion at C5-6 and C6-7; mild bilateral C3-4, C4-5, C5-6 and minimal left C6-7 uncovertebral spurring, but with no significant foraminal stenosis at any level; and no central canal stenosis at any level.  (Tr. 237.)  Noting the CT scan to show solid fusion, Dr. Rutz recommended that plaintiff take non-narcotic pain medication and over-the-counter medication.  (Tr. 227.)

Between April 2006 and January 2007, Dr. Lucas prescribed Prozac, ibuprofen, Trazodone, Alprazolam, Albuterol, Paxil, Prednisone, and hormone replacement therapy for plaintiff.  (Tr. 350.)

A CT scan of the cervical spine dated May 10, 2007, showed anterior plating from C5 through C7 with a defect through the C6-7 disk space suggesting lack of fusion and possible fracture through the implant with intact plate.  The fusion between C5-6 was noted to be solid.  (Tr. 276.)

On May 10, 2007, Dr. Rutz administered an injection of Depo-Medrol for plaintiff's bilateral shoulder bursitis with marked improvement in symptoms.  Dr. Rutz noted a CT scan of the cervical spine to show the fusion from C5 to C7 to be solid.  Plaintiff was referred to physical therapy for her shoulder condition.  (Tr. 247-51, 369, 370.)

On July 16, 2007, Dr. Lucas prescribed Vicodin and instructed plaintiff to continue with Trazodone for her continued complaints of neck pain.  (Tr. 310-11.)

On August 27, 2007, physical examination was normal for plaintiff's annual well woman examination. Plaintiff had no musculoskeletal complaints. (Tr. 312-13.)

On December 17, 2007, plaintiff returned to Dr. Lucas with complaints relating to allergies. No musculoskeletal complaints were reported. (Tr. 315.)

Plaintiff visited Dr. Lucas on March 12, 2008, with concerns that she may have suffered whiplash after a fall. Examination was unremarkable. Dr. Lucas diagnosed plaintiff with cervicalgia and prescribed Flexeril. An injection of Depo-Medrol was administered to the right shoulder for subacromial bursitis. (Tr. 316-17.)

An MRI of the cervical spine dated May 1, 2008, showed mild posterior disc bulge at C7-T1 but without significant stenosis and no evidence of disc herniation or neuroforaminal narrowing. Anterior fusion of the C5-C7 was noted. (Tr. 260.) MRIs of the right and left shoulders dated May 16 yielded negative results. (Tr. 259, 261.) Upon review of the MRI results, Dr. Rutz noted there to be no neurological impingement, and he had no concerns. Dr. Rutz recommended that plaintiff continue with her pain management physician. (Tr. 277, 309.)

Plaintiff visited Midwest Orthopedic Group on four occasions in May 2008 for chiropractic treatment. With each visit, physical examination showed muscle spasm about the cervical spine and in the trapezius. Plaintiff was diagnosed with

intersegmental joint dysfunction of the occiput, cervical spine, and thoracic spine. (Tr. 278-82.)

On June 2, 2008, Dr. Lucas instructed plaintiff to continue with Vicodin for her disc disease of the cervical spine. (Tr. 318-19.)

Plaintiff returned to Midwest Orthopedic Group on June 12, 2008, for chiropractic treatment by Dr. Stephen Orr and injection therapy by Dr. James N. Moore. (Tr. 283.) Plaintiff reported feeling better with Celestone injections, and additional injections were administered on June 16. (Tr. 285.)

Plaintiff returned to Dr. Lucas on August 14, 2008, and had no musculoskeletal complaints. (Tr. 320-21.)

Plaintiff underwent additional chiropractic therapy by Dr. Orr on September 25, 2008. (Tr. 286.)

Plaintiff returned to Dr. Lucas on October 15, 2008, and had no musculoskeletal complaints. Physical examination was unremarkable. (Tr. 322-24.)

On January 8 and 13, 2009, plaintiff was administered additional injections by Dr. Orr in response to her continued complaints of pain and spasms in her shoulders and scapular areas. (Tr. 287.)

Plaintiff visited Dr. Lucas on February 25, 2009, with complaints relating to bronchitis. No musculoskeletal complaints were made. Dr. Lucas instructed

plaintiff to continue with Vicodin for cervicalgia. (Tr. 325-26.)

An MRI of the cervical spine dated April 8, 2009, showed mild C7-T1 disc bulge and/or osteophyte, but no evidence of nerve root or cord impingement. (Tr. 262.) Additional chiropractic treatment and trigger point injections were administered by Dr. Orr. On April 21, plaintiff reported to Dr. Orr that she could manage her activities of daily living without difficulty. (Tr. 288, 290, 293, 294.) Additional trigger point injections were administered on May 5. (Tr. 296.)

Plaintiff visited Dr. Lucas on May 6, 2009, and reported being frustrated with Dr. Moore for pain management. Physical examination showed plaintiff to have multiple trigger points in the shoulders. Plaintiff had full range of motion but with pain. Plaintiff was instructed to stop Vicodin but to continue with Percocet. Samples of Lyrica were given. Plaintiff was referred to Dr. Baldassare. (Tr. 327-28.)

Plaintiff returned to Dr. Orr on May 20, 2009, and complained of continued soreness but reported that she could manage her activities of daily living without difficulty. Chiropractic treatment was administered. (Tr. 298.)

On June 15, 2009, plaintiff reported to Dr. Lucas that Lyrica seemed to help some. It was noted that Dr. Orr reported that MRI testing showed the bulging to have worsened and that plaintiff should see a surgeon. Physical examination was unchanged. Plaintiff was instructed to continue with Percocet. (Tr. 329-30.)

Plaintiff underwent chiropractic treatment that same date with Dr. Orr.  (Tr. 437.)

EMG studies conducted on July 14, 2009, yielded findings consistent with bilateral C6 radiculopathy.  (Tr. 268.)

Plaintiff visited Dr. Andrew R. Baldassare on July 17, 2009, who noted plaintiff to have had symptoms of pain around her neck and shoulders for many years.  Dr. Baldassare summarized plaintiff's medical history as follows:

> In 2006 she was diagnosed as having a cervical disc at C5-C6 and C6-C7 and underwent surgery mainly for the pain in her right scapula.  This has gone away but she subsequently about one year after surgery developed increased pain around her neck area, shoulders, hands, elbows, hips, and knees.  This has increased recently.

(Tr. 302.)  Upon examination, Dr. Baldassare determined fibromyalgia syndrome to be to the primary diagnosis, and Celebrex was prescribed.  (Tr. 302-03.)

Plaintiff reported to Dr. Lucas on July 20, 2009, that Lyrica no longer helped.  Dr. Lucas noted plaintiff to have more than four tender trigger points about the right shoulder.  Plaintiff was diagnosed with fibromyalgia, and trigger point injections were administered.  (Tr. 331-32.)

On September 2, 2009, Dr. Lucas prescribed Cymbalta for fibromyalgia.  Plaintiff was instructed to continue with Percocet for her disc disease.  (Tr. 333-34.)  On September 22, plaintiff was administered trigger point injections for her neck and shoulder pain.  (Tr. 335-36.)

Plaintiff visited Dr. Baldassare on September 28, 2009, and complained of

stiffness all over.  Tenderness was noted about all of the trigger points.

Examination of the joints was normal.  Dr. Baldassare continued in his diagnosis of

fibromyalgia and instructed plaintiff to increase her dosage of Lyrica.  (Tr. 559-

60.)

Plaintiff visited Dr. Lucas on October 8, 2009, and reported continued pain

in her upper back and neck.  Plaintiff had full range of motion but with pain.  Dr.

Lucas noted plaintiff to have multiple trigger points in the shoulders and right

biceps region.  Plaintiff had normal sensation, motor strength, and gait.  Dr. Lucas

diagnosed plaintiff with fibromyalgia and prescribed Percocet and Lyrica.  A

TENS unit was also prescribed.  (Tr. 337-38.)

On October 13, 2009, plaintiff visited Dr. Ravi V. Shitut for orthopedic

evaluation.  Dr. Shitut noted plaintiff's medical history to include cervical

discectomy and fusion in March 2006, postoperative therapy, steroid injections,

and medication therapy.  Plaintiff reported having difficulty with physical activities

and that she experienced increased symptoms with her past work as a dog groomer

and massage therapist.  Dr. Shitut noted plaintiff's medications to include

Cymbalta, Prozac, Lyrica, Meloxicam, Flexeril, Trazodone, Alprazolam,

Fluoxetine, Percocet, and ibuprofen.  Physical examination showed diffuse

posterior cervicothoracic tenderness.  Mild head compression was positive, but

sensory, motor, and reflex examination of the upper extremities was normal.  No

atrophy was seen. Dr. Shitut noted recent MRI results to show minor bulging of the C7-T1 disc with questionable clinical significance. Dr. Shitut reported the evaluation to show fibromyalgia pain syndrome rather than pain from cervical disc disease. Dr. Shitut recommended that plaintiff not undergo additional surgery inasmuch as her pain pattern did not suggest a discogenic cervical disease. Dr. Shitut opined that plaintiff's radiculopathy may be residual from her previous problem and not a new problem and that additional surgery would not help. Dr. Shitut recommended that plaintiff see a pain management specialist. (Tr. 299-301.)

Plaintiff visited Dr. Michael S. Boedefeld, a pain specialist, on October 29, 2009, and reported a twenty-four-year history of pain in her back and shoulder. Dr. Boedefeld noted plaintiff's medical history and results of diagnostic testing. Upon examination, Dr. Boedefeld diagnosed plaintiff with cervicalgia, post cervical fusion syndrome, cervical facet arthropathy, cervical radiculopathy, and fibromyalgia. Cervical medial branch nerve blocks were administered. (Tr. 457-61.) Additional blocks were administered on November 19 (Tr. 463-65), and an epidural steroid injection was administered on December 2 (Tr. 468-70).

On December 21, 2009, plaintiff visited Dr. Boedefeld and underwent cervical median branch radiofrequency denervation for her continued complaints of neck and shoulder pain. Plaintiff was continued on Percocet for pain. (Tr. 475-

77.)  Plaintiff continued to see Dr. Boedefeld through July 2011 for pain management, including medication therapy with Percocet and Embeda, additional nerve blocks, and epidural steroid injections.  (Tr. 567-86.)

On February 22, 2010, Dr. Baldassare noted plaintiff to not be doing well. Plaintiff reported having continued pain and swelling.  Dr. Baldassare noted plaintiff to be seeing a pain management specialist and to be on morphine therapy. Physical examination showed plaintiff to have eighteen out of eighteen tender trigger points.  Dr. Baldassare continued in his diagnosis of fibromyalgia and instructed plaintiff to continue with her medications.  Dr. Baldassare opined that plaintiff was incapable of gainful employment due to the severity of her pain.  (Tr. 497-99.)

On April 6, 2010, Dr. Orr completed a Physical Medical Source Statement (MSS) in which he opined that plaintiff could sit for one hour, stand for one hour, and walk for one hour in an eight-hour workday.  Dr. Orr opined that plaintiff could frequently lift and carry five to ten pounds and occasionally lift and carry twenty pounds.  Dr. Orr opined that plaintiff experienced significant manipulative limitations in both hands, was limited in balancing, and could occasionally reach above her head and occasionally stoop.  Dr. Orr opined that plaintiff's pain would preclude focusing on simple tasks on a sustained basis in an eight-hour workday. Dr. Orr opined that plaintiff would miss work at least three times a month and

would need to lie down and take more than three breaks during a normal eight-hour workday.  Dr. Orr reported plaintiff's impairments to have "progressive onset dating back 20 years according to the patient."  (Tr. 531-34.)

On April 18, 2010, Dr. Baldassare completed an MSS in which he opined that plaintiff could sit for two hours in an eight-hour workday, stand for one hour, and walk for one hour.  Dr. Baldassare opined that plaintiff's pain would preclude focusing on simple tasks on a sustained basis in an eight-hour workday.  Dr. Baldassare opined that plaintiff would miss work at least three times a month.  Dr. Baldassare opined that plaintiff could occasionally lift and carry five to ten pounds, and experienced significant manipulative limitations in both hands.  Dr. Baldassare also opined that plaintiff could never reach above her head or stoop.  Dr. Baldassare opined that plaintiff would need to lie down and take more than three breaks during a normal eight-hour workday.  Dr. Baldassare noted the earliest date upon which plaintiff experienced such limitations to be unknown.  (Tr. 500-03.)

Plaintiff visited Dr. Baldassare in May 2010 and continued to see Dr. Amanda Dehlendorf from his office through July 2011 for continued treatment of fibromyalgia.  (Tr. 541-55.)

On October 11, 2010, plaintiff underwent a consultative examination for disability determinations.  Dr. Llewellyn Sale, Jr., noted plaintiff's medical history.  Plaintiff reported having had back problems for twenty-five years.  Upon

conclusion of the physical examination, Dr. Sale noted plaintiff to have had multiple back problems and to meet the criteria of fibromyalgia because of her trigger point tenderness. (Tr. 505-08.) In an MSS completed that same date, Dr. Sale opined that plaintiff currently could occasionally lift and carry up to ten pounds; sit for one hour, stand for thirty minutes, and walk for twenty minutes at one time; sit for three hours total, stand for two hours total, and walk for one hour total in an eight-hour workday; and occasionally reach, handle, feel, finger, push, and pull and occasionally operate foot controls. Dr. Sale opined that plaintiff could occasionally climb stairs and ramps, balance, and stoop, but should never engage in other postural activities such as kneeling and crouching. Dr. Sale opined that plaintiff could perform activities like shopping, traveling alone, and climbing a few steps with use of a hand rail but could not handle files or walk a block at a reasonable pace on rough or uneven surfaces. (Tr. 510-15.)

An MRI of the left shoulder dated November 4, 2010, showed mild tendinosis of the supraspinatus tendon. (Tr. 614.)

Plaintiff visited Dr. Lucas on December 14, 2010, with complaints of hip and knee pain. Examination showed tenderness and muscle spasm about the spine with restricted range of motion. Plaintiff was prescribed Percocet, and a Depo-Medrol injection was administered to the left shoulder for rotator cuff tendinitis. (Tr. 617-18.) Plaintiff continued treatment with Dr. Lucas through August 2011

with Percocet, osteopathic manipulation to the thoracic spine, and Depo-Medrol injections for tendinitis. (Tr. 622-29.)

On August 17, 2011, Dr. Lucas completed an MSS in which he opined that plaintiff could sit for thirty minutes, stand for thirty minutes, and walk for fifteen minutes in an eight-hour workday. Dr. Lucas opined that plaintiff could lift and carry up to five pounds, had significant manipulative limitations with both hands, and could occasionally reach above her head and occasionally stoop. Dr. Lucas opined that plaintiff's pain would preclude focusing on simple tasks on a sustained basis in an eight-hour workday. Dr. Lucas opined that plaintiff would miss work at least three times a month. Dr. Lucas opined that plaintiff would occasionally need a cane and would need to lie down and take more than three breaks during a normal eight-hour workday. Dr. Lucas reported that plaintiff had had problems since 2000, but they were at the reported severity since 2006. (Tr. 527-30.)

## IV. Third Party Correspondence

In a letter dated November 18, 2011, plaintiff's friend, Joyce Plunkett, wrote that plaintiff has had chronic neck and shoulder pain since 2000 which has progressively worsened every year. Ms. Plunkett wrote that plaintiff had neck surgery to correct the extreme pain but that the surgery did not help. (Tr. 652.)

In a letter dated November 20, 2011, plaintiff's daughter-in-law, Nicole Taylor, wrote that she had observed plaintiff suffer from pain within the past

fourteen years. Ms. Taylor wrote that the pain in plaintiff's neck, shoulders, back, and legs prevented plaintiff from being able to work and caused her to undergo many painful treatments, including surgery. Ms. Taylor wrote that all attempts to help the pain were unsuccessful and that she witnessed plaintiff stay in bed because of pain and fatigue. Ms. Taylor wrote that plaintiff has had to endure such pain for years. (Tr. 653.)

In a letter dated November 25, 2011, plaintiff's husband, Gerald Wells, wrote that plaintiff had had problems with her neck and shoulders since 1996 and that she quit her job as a dog groomer in 2001 because of chronic pain. Mr. Wells wrote that plaintiff's pain worsened over the years and that she had to quit another job because of the same problems. Mr. Wells wrote that he and plaintiff planned to buy a dog grooming business in 2006 but did not do so because plaintiff could not perform the grooming duties. Mr. Wells wrote that plaintiff began experiencing more problems subsequent to fusion surgery and that no treatment has helped her condition. Mr. Wells wrote that he performs all of the household duties and must help plaintiff with her activities of daily living. (Tr. 650-51.)

## V. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2005. The ALJ found plaintiff not to have engaged in substantial gainful activity from July 1, 2003, to December 31,

2005.  The ALJ found that, through December 31, 2005, plaintiff had the severe impairment of disorders of the back, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found that, through December 31, 2005, plaintiff had the RFC to perform the full range of light work. While questioning whether plaintiff's past work satisfied the earnings criteria for substantial gainful activity, the ALJ determined that, through December 31, 2005, plaintiff was unable to perform any past relevant work.  Considering plaintiff's age, education, work experience, and RFC through December 31, 2005, the ALJ determined the Medical-Vocational Guidelines to direct a finding of "not disabled."  The ALJ thus found that plaintiff was not under a disability at any time from July 1, 2003, through December 31, 2005.  (Tr. 27-38.)

## VI.  Discussion

A claimant seeking DIB under Title II of the Social Security Act must establish a disability that existed prior to the expiration of her insured status. *Martonik v. Heckler*, 773 F.2d 236, 238 (8th Cir. 1985).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An

individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is

declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's

impairments.

6.      The testimony of vocational experts when required which is
        based upon a proper hypothetical question which sets forth the
        claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir.

1992) (internal citations omitted).  The Court must also consider any evidence

which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at

770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even

though two inconsistent conclusions may be drawn from the evidence, the

Commissioner's findings may still be supported by substantial evidence on the

record as a whole.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)

(citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is

substantial evidence on the record as a whole, we must affirm the administrative

decision, even if the record could also have supported an opposite decision."

*Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks

and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977

(8th Cir. 2003).

        The predominant issue in this case is whether plaintiff was disabled by her

impairments before her insured status expired on December 31, 2005.  *See*

*Martonik,* 773 F.2d at 238.  Plaintiff challenges the manner by which the ALJ

determined she was not so disabled, including the extent to which medical

evidence supports the RFC determination and the manner by which the ALJ discounted plaintiff's subjective complaints. For the following reasons, the ALJ committed no legal error, and his decision is supported by substantial evidence on the record as a whole.

As an initial matter, the undersigned notes that plaintiff does not challenge the ALJ's determination that her musculoskeletal condition of disorders of the back was her only severe impairment during the relevant period and that her fibromyalgia and/or mental impairments were non-severe and/or not medically determinable prior to December 31, 2005. As such, to be considered disabled, plaintiff's musculoskeletal impairment must have prevented her from doing her past relevant work or any other substantial gainful work in the national economy during the relevant period. 20 C.F.R. § 404.1505(a).

In cases such as this that involve degenerative disease of a non-traumatic origin where there is no contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnoses of the claimant's doctors. *Grebenick v. Chater*, 121 F.3d 1193, 1199 (8th Cir. 1997). The ALJ did so here.

With respect to the medical evidence and the retrospective opinions rendered by plaintiff's physicians, a review of the ALJ's decision shows him to have

thoroughly considered all such evidence of record, including that prior to December 31, 2005, and all subsequent evidence through 2011. As noted by the ALJ, there are few clinical findings relating to plaintiff's musculoskeletal impairment prior to December 31, 2005, with the evidence showing assessments of shoulder pain, allergies, and asthma between March and December 2005 and diagnostic testing yielding negative results. In addition, while plaintiff was diagnosed with tendinitis beginning in June 2005 and physical therapy resolved the related pain only temporarily, the undersigned notes that plaintiff was never prescribed significant pain medication during this period and, indeed, was first prescribed such upon completion of her surgery in March 2006. While plaintiff's treating physician during the relevant time, Dr. Lucas, opined in August 2011 that plaintiff's impairment and associated pain prevented her from engaging in work-related activities such as sitting, standing, or walking longer than thirty minutes, lifting more than five pounds, and concentrating on a sustained basis, the ALJ properly noted that such limitations were not supported by the objective diagnostic testing, medical treatment sought, and clinical signs before the date last insured. If a treating doctor's retrospective diagnosis is based upon a medically accepted clinical diagnostic technique, then it must be considered in light of the entire record to determine whether it establishes the existence of a physical impairment prior to the expiration of the claimant's insured status. *Grebenick*, 121 F.3d at

1199. As noted by the ALJ, however, Dr. Lucas's retrospective opinion as to plaintiff's limitations enjoys no clinical or diagnostic support in the record relevant to the period at issue and, indeed, Dr. Lucas stated in his MSS that plaintiff did not experience the opined limitations at the severity reported until 2006. Substantial evidence supports this conclusion.

The contemporaneous medical records show that plaintiff began to complain of shoulder pain in June 2005 upon which Dr. Lucas diagnosed tendinitis. MRIs of the shoulders dated August 2005 yielded negative results. Plaintiff participated in physical therapy, which provided temporary relief. At no time during this period did plaintiff's treating physician or any other physician prescribe pain medication other than ibuprofen for plaintiff's shoulder pain. Diagnostic testing of the cervical spine in early February 2006 showed evidence of degenerative disc disease with small disc herniation and evidence of radiculopathy. Conservative treatment was recommended and pain medication was not considered at that time. Some of plaintiff's symptoms resolved with a nerve block injection in mid-March, but plaintiff underwent cervical spine fusion surgery in late March in an effort to resolve her remaining symptoms of radiating neck pain. Upon discharge from this surgery, plaintiff was prescribed pain medication. Continued injection therapy resulted in plaintiff's decreased need for oral pain medication by mid-May, and plaintiff's treating orthopedist noted plaintiff to have no restrictions. While

plaintiff's complaints of upper back pain prompted her to return to physical therapy in September 2006, plaintiff continued not to take any pain medication, and the medical evidence shows neither Dr. Lucas nor any other physician to have prescribed any significant pain medication for plaintiff during this period. Further, additional diagnostic testing in October 2006 yielded no significant findings. Plaintiff did not receive additional injection therapy until May 2007, and oral pain medication was first prescribed for her shoulder and neck pain in July 2007. From August 2007 to March 2008, plaintiff made no musculoskeletal complaints to her treating physician despite visiting him for other routine health matters. Beginning in March 2008 and continuing thereafter, plaintiff received injection therapy, chiropractic therapy, and prescription pain medication for her impairment. Diagnostic testing during this period continued to show only mild conditions. Plaintiff was ultimately diagnosed with fibromyalgia in July 2009. As such, while the record indicates that plaintiff's health worsened in the years subsequent to the expiration of her insured status, the record fails to show disability during the relevant time period. *See Turpin v. Colvin*, ___ F.3d ___, No. 13-2269, 2014 WL 1797396, at *5 (8th Cir. May 7, 2014).

Plaintiff challenges the ALJ's determination to accord little weight to the opinions of Drs. Baldassare, Lucas, Orr, and Sale that plaintiff experienced limitations that effectively precluded her from engaging in any work-related

activities. Notably, none of these physicians rendered an opinion based on diagnostic or clinical evidence that plaintiff experienced such limitations prior to December 31, 2005. Because the medical records do not support a finding that plaintiff experienced the limitations as opined by these physicians during the relevant period, the ALJ did not err in according only limited weight to this opinion evidence. *Grebenick*, 121 F.3d at 1199. *See also Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008) (ALJ not required to give controlling weight to retrospective diagnosis unsupported by diagnostic testing).

Where there is no objective medical evidence of a disabling impairment prior to the expiration of a claimant's insured status, proof of disability depends substantially upon subjective evidence, thereby making the credibility determination a critical factor in the ALJ's decision. *Basinger v. Heckler*, 725 F.2d 1166, 1169-70 (8th Cir. 1984); *see also Grebenick*, 121 F.3d at 1199-1200. Plaintiff claims here that the ALJ failed to make specific findings regarding her credibility and did not provide sufficient reasons to discount plaintiff's subjective complaints. For the following reasons, plaintiff's claim is without merit.

In determining a claimant's credibility, the ALJ must consider all evidence relating to her complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage,

effectiveness and side effects of medication; and any functional restrictions.
*Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739
F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). While an ALJ need
not explicitly discuss each *Polaski* factor in his decision, he nevertheless must
acknowledge and consider these factors before discounting a claimant's subjective
complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). Where an ALJ
explicitly considers the *Polaski* factors but then discredits a claimant's complaints
for good reason, the decision should be upheld. *Hogan v. Apfel,* 239 F.3d 958, 962
(8th Cir. 2001). The determination of a claimant's credibility is for the
Commissioner, and not the Court, to make. *Tellez v. Barnhart,* 403 F.3d 953, 957
(8th Cir. 2005); *Pearsall*, 274 F.3d at 1218.

Here, the ALJ acknowledged and considered the *Polaski* factors in
discounting plaintiff's subjective complaints of pain as experienced during the
relevant period. *See Halverson,* 600 F.3d at 931-32. In addition to noting that
objective medical evidence did not support plaintiff's allegations of a disabling
condition during the relevant period, the ALJ also noted the record to show that
plaintiff sought very little treatment between the alleged onset date in July 2003
and December 31, 2005, the date last insured. *See id.* (ALJ's credibility
determination may include consideration of absence of objective medical evidence
to support complaints); *Black v. Apfel*, 143 F.3d 383, 386-87 (8th Cir. 1998)

(conservative course of treatment inconsistent with complaints of debilitating pain).  The ALJ further noted that while plaintiff testified that her current daily activities included a limited ability to drive because of difficulty with her arms, no medical source imposed restrictions on plaintiff prior to her date last insured, despite their knowledge that plaintiff intended to return to work as a dog groomer. *See Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999) (claimant's complaints undermined by lack of significant restrictions placed on him by his doctors).  The ALJ also considered plaintiff's work history, noting that plaintiff was not consistently motivated to work as demonstrated by her highest level of earnings to have been in 1994 and that she stopped working full time in 1994 because the store at which she worked had closed.[2]  *See Wildman,* 596 F.3d at 968-69 (claimant's sporadic work history prior to alleged onset date constituted valid reason to discredit subjective complaints); *Polaski*, 739 F.2d at 1322 (work history relevant to credibility determination).  Because these reasons to discredit plaintiff's subjective complaints of pain as experienced during the relevant period are supported by substantial evidence on the record as a whole, the Court must defer to the ALJ's adverse credibility determination.  *Wildman,* 596 F.3d at 968-69.

Further, contrary to plaintiff's assertion, the ALJ also considered the third

---

[2] Plaintiff's earnings record shows that plaintiff earned approximately $18,400.00 in 1994.  Since that time, plaintiff's yearly earnings through 2003 ranged between $450.00 and $6,600.00. Plaintiff has had no reported earnings since 2003.  (Tr. 116-20.)

party statements and found them not entitled to significant weight given that medical evidence did not support their allegations, that they were given by persons who lacked medical training and expertise to make exacting observations, and were made by friends and family who could not be considered disinterested and would tend to be colored by affection and a natural tendency to agree with plaintiff. Because these findings are supported by substantial evidence on the record, they cannot be disturbed. *Perkins v. Astrue*, 648 F.3d 892, 901 (8th Cir. 2011) (third party statements not entirely credible where they are inconsistent with the record as a whole and likely influenced by affection for claimant).

Accordingly, in a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from her credibility. Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012); *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

Upon consideration of the specific medical facts, nonmedical evidence, and inconsistencies in the record, the ALJ determined that plaintiff had the RFC to perform the full range of light work prior to December 31, 2005. Plaintiff

contends that no medical evidence supports this finding and that the ALJ failed to undergo the required analysis in reaching this RFC conclusion.

RFC is what an individual can still do despite her functional limitations and restrictions caused by her medically determinable impairments. The RFC assessment considers only those limitations and restrictions that are caused by an individual's physical or mental impairments and represents the individual's maximum remaining ability to perform sustained work on a regular and continuing basis. SSR 96-9p, 1996 WL 374185, at **1-2 (Soc. Sec. Admin. July 2, 1996). Some medical evidence must support the ALJ's RFC findings. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003).

Plaintiff claims that the ALJ erred in the manner by which he determined plaintiff to have the RFC to perform the full range of light work inasmuch as he failed to undergo the required function-by-function analysis and provide a narrative summary to support his findings. Plaintiff contends that the ALJ's failure to engage in the proper analysis is evident because a review of the medical evidence shows plaintiff not to have had the ability to perform the full range of light work, and specifically, that the limited use of her arms caused by shoulder and neck pain resulted in a limited ability to reach, push, pull, lift, carry, and

manipulate objects.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). In addition, unskilled light jobs require the use of arms and hands to grasp and to hold and turn objects. SSR 83-10, 1983 WL 31251, at *6 (Soc. Sec. Admin. 1983).

Here, the ALJ thoroughly summarized all of the medical evidence of record, which showed that plaintiff neither exhibited nor complained of any symptoms limiting her ability to walk, stand, or sit during the relevant period. Notably, plaintiff does not contend that her inability to perform light work is restricted by any such limitations. To the extent plaintiff contends that the ALJ failed to consider manipulative restrictions caused by the limited use of her arms, the medical evidence likewise shows no limitations that would preclude the performance of light work on or prior to December 31, 2005. Plaintiff's first complaint relating to any upper extremity impairment came in June 2005 when her complaints to Dr. Lucas resulted in a diagnosis of shoulder tendinitis. Limited range of motion about the shoulder was thereafter noted in June and August 2005, with continued limited motion in March 2006. Plaintiff exhibited no significant

upper extremity weakness, however, with full strength noted about both upper extremities in February and early March 2006 and no hand weakness. *Cf. Grebenick*, 121 F.3d at 1201 (where evidence shows that claimant with degenerative condition was not disabled after insured status expired, it follows that claimant was not disabled during period of insured status). Only ibuprofen was prescribed during this period for pain. *See Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996) (lack of significant pain medication suggests that severity of pain does not preclude light work). Nor does the evidence show postural limitations during the relevant period. Indeed, the evidence shows plaintiff never to have complained of a limited ability to climb, balance, stoop, kneel, crouch, or crawl during this period, and no objective evidence shows such limitations. Although plaintiff claims that the ALJ nevertheless should have engaged in a function-by-function analysis relating to manipulative and postural abilities, an ALJ is not required to mechanically list and reject every possible limitation. *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). Because a review of the ALJ's decision shows that the ALJ thoroughly considered all of the evidence of record and not to have overlooked relevant evidence or ignored potential limitations, the ALJ's failure to specifically address plaintiff's postural and manipulative abilities did not affect the determination and does not warrant reversal. *See Lynch v. Astrue*, No. 4:10-CV-01035 NAB, 2011 WL 3943851, at *12 (E.D. Mo. Sept. 7, 2011).

A review of the decision shows the ALJ to have thoroughly discussed specific medical facts, nonmedical evidence, and the consistency of such evidence when viewed in light of the record as a whole and to have assessed plaintiff's RFC based on the relevant, credible evidence of record. *Accord* SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). While the ALJ accorded limited weight to the opinion evidence of record, the absence of *opinion* evidence does not undermine an ALJ's RFC determination where other medical evidence in the record supports the finding. *See Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007); *see also Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004) (lack of opinion evidence not fatal to RFC determination where ALJ properly considered available medical and testimonial evidence). Because some medical evidence supports the ALJ's determination that plaintiff could perform light work during her period of insured status, the ALJ's RFC assessment must stand. *See Steed v. Astrue*, 524 F.3d 872, 875-76 (8th Cir. 2008).

Finally, plaintiff claims that the ALJ should have elicited a medical advisor's opinion as to the onset date of her disability. Such an opinion is required only if the existing medical evidence is ambiguous as to whether a disability may have begun prior to the expiration of plaintiff's insurance status. *Grebenick*, 121 F.3d at 1200-01. There is no ambiguity in this case. As discussed above, the medical records show that plaintiff's symptoms were not so severe prior to

December 31, 2005, that any question would be raised as to whether plaintiff's musculoskeletal impairment could be considered disabling on or before December 31, 2005. The ALJ did not err in failing to seek the opinion of a medical advisor in this cause. *Id.* at 1201.

### VII. Conclusion

The record as a whole suggests that plaintiff's condition may have deteriorated in the years following her insured status. If the period subsequent to December 31, 2005, was the focus of the ALJ's determination, perhaps the decision would be different. However, the issue of plaintiff's disability must be evaluated based on her condition as of December 31, 2005, her date last insured. In considering the evidence relevant to that period, this Court's role is to determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Because a reasonable mind can find the evidence of record sufficient to support the ALJ's determination, the ALJ's decision must be affirmed. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001); *Lynch*, 2011 WL 3943851, at *13.

Accordingly, for the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled on or prior to December 31, 2005, is supported by substantial evidence on the record as a whole, and plaintiff's claims of error should be denied. Inasmuch as there is

substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir. 1992). *See also Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


 _/s/ Terry I. Adelman_
UNITED STATES MAGISTRATE JUDGE


Dated this 18th day of July, 2014.